IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 6, 2014

**MONTREL GILLIAM v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 07-00648     Lee V. Coffee, Judge**

**No. W2013-01187-CCA-R3-PC  - Filed June 25, 2014**

The Petitioner, Montrel Gilliam, appeals from the denial of post-conviction relief by the Criminal Court for Shelby County.  He was convicted of first degree premeditated murder and three counts of attempted first degree murder and received an effective sentence of life imprisonment plus sixty-seven years in the Tennessee Department of Correction. On appeal, the Petitioner argues that he received ineffective assistance of counsel.  Upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ALAN E. GLENN, J., joined.

R. Todd Mosley (on appeal) and James P. DeRossitt, IV (at hearing), Memphis, Tennessee, for the Petitioner-Appellant, Montrel Gilliam.

Robert E. Cooper, Jr., Attorney General and Reporter; Meredith DeVault, Senior Counsel; Amy P. Weirich, District Attorney General; and Ann Schiller, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The underlying facts supporting the Petitioner's convictions stem from ongoing tension between residents of Ridgecrest Apartments and Douglas Community in Memphis, Tennessee.  On the day of the offense, Latasha Mims, who was born and raised in the Douglas Community, was visiting a friend, Marsha Patten, in the Ridgecrest Apartment Complex.  Mims had been threatened earlier in the day by a man, later identified as the Petitioner, who told her, "Bitch, you going to get got tonight."  Later that night, Patten and her boyfriend, Alexander Collier, left the Ridgecrest Apartments to go to the store.  As they

were driving down Woodcliff Road, they heard gunshots. A bullet came through the driver's door, shattered the glass, and struck Collier in the thigh. A playground area was located south of Woodcliff Road between the location of the apartment complex and the origin of the gunshots. Four-year-old Donttreius Taylor was shot in the arm, and eleven-year-old Martez Henderson was fatally shot and killed. Mikeisha Holmes testified at trial that she observed the Petitioner "raise[] his gun and fire[] four gunshots at a car that was traveling down the street." The Petitioner was convicted as charged, and the trial court imposed an effective sentence of life imprisonment plus sixty-seven years for the four convictions, which was affirmed by this court on appeal. State v. Montrel Gilliam, No. W2009-01664-CCA-R3-CD, 2011 WL 1744226 (Tenn. Crim. App. May 4, 2011), perm. app. denied (Tenn. Aug. 24, 2011).

On June 4, 2012, the Petitioner filed a timely pro se petition for post-conviction relief, alleging six claims for relief based on ineffective assistance of counsel. The Petitioner was subsequently appointed counsel, who filed two amended petitions on the Petitioner's behalf. The Petitioner, Tristan Dorsey, trial counsel, and co-counsel testified at the March 27, 2012 post-conviction hearing.[1]

**Post-Conviction Hearing.** The Petitioner testified that trial counsel and co-counsel represented him at his murder trial. He said he met with trial counsel "about five times" and that trial counsel did not involve him in the defense. He stated that on the day of the shooting, he spent half the day with Tristan Dorsey because it was Dorsey's birthday. He said they spent most of their time in Dorsey's car and that they returned to the Ridgecrest Apartments at 5:00 p.m. The Petitioner recalled that Latasha Mims testified for the State at trial. He said he never threatened Mims that day but that he spoke to her in a joking manner and that Dorsey was present. He stated that his investigator, Rachael Geiser, had identified Dorsey as a positive witness for the defense. The Petitioner said that Dorsey was available at trial but that he never testified. He faulted trial counsel for not presenting Dorsey's testimony. He said that trial counsel told him that Dorsey was not a good witness because he had pending charges.

The Petitioner testified that on the day after the shooting, Mikeisha Holmes was interviewed in a television news report and that her face was blurred out. He stated that Holmes told the reporters, "'Whoever the shooter was, he wasn't trying to shoot no kids[.]'" He said he knew the woman in the interview was Holmes because he "used to date her." He stated that Holmes was hostile toward him because she discovered that he was dating another

---

[1] We only address the testimony from the hearing relevant to the issues that the Petitioner raised in his appellate brief. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

woman. The Petitioner told trial counsel about the television interview. He said that trial counsel told him that the video could not be used to cross-examine Holmes because the woman's face was not visible.

The Petitioner acknowledged that trial counsel visited the Ridgecrest Apartments on multiple occasions. However, he believed that trial counsel should have conducted a more thorough investigation and interviewed more witnesses about the shooting. Because there were different shell casings found at the crime scene, the Petitioner opined that trial counsel could have discovered other suspects. He maintained that he did not shoot anyone on the night of June 22, 2006, and that he "didn't even have a handgun."

On cross-examination, the Petitioner acknowledged that trial counsel had confronted Mikeisha Holmes about the news report and that Holmes denied being interviewed. He stated that trial counsel should have played the video for the jury at that point because it was obvious that the woman was Holmes. He agreed that there are rules of evidence, but he believed that trial counsel could have entered the video into evidence. The Petitioner did not recall that his investigator had noted in her analysis that Tristan Dorsey had seen him with a gun on prior occasions. He agreed that it would be damaging to his case to have a defense witness testify that the Petitioner was a close friend and that the Petitioner had a gun.

Tristan Dorsey testified that he grew up with the Petitioner in the Ridgecrest Apartments. He stated that June 22, 2006, was his birthday and that he spent most of the day with the Petitioner. He saw Latasha Mims that day but denied that the Petitioner threatened Mims. He said he dropped the Petitioner off when he had to pick up his friend from work. Dorsey did not see the Petitioner with a gun that day, and he had no reason to believe that the Petitioner had any problems with anyone.

On cross-examination, Dorsey acknowledged that he had prior convictions for various drug offenses and that he violated his probation. He said he had carried a gun before but denied having a gun on the day of the shooting. He testified that he had never seen the Petitioner with a gun in his hand. Dorsey denied that he was selling drugs that day. He said the Petitioner was "a good kid" and not a troublemaker. He stated that he had never seen the Petitioner get into a fight with anyone.

Upon questioning from the post-conviction court, Dorsey testified that he was not present when the shooting occurred. He said he dropped the Petitioner off around 5:00 or 6:00 p.m. and that he did not know what the Petitioner was doing later that evening. He stated that when he told the investigator that he had seen the Petitioner with a gun before, he meant that they have "been around guns all the time" in their neighborhood but that he had never seen the Petitioner with a gun in his hand. Dorsey stated that Holmes could not have

witnessed the shooting from where she claimed to have been and that there was a direct view of the playground from the hallway where everyone was hanging out.

The State called trial counsel after the close of the Petitioner's proof. Trial counsel testified that he began practicing law in October of 1997. Since then, he had handled approximately forty first degree murder cases. He said that about thirty of those cases went to trial. He stated that he was capital-certified in Tennessee. Trial counsel was appointed to the Petitioner's case in June of 2007. He said he requested an investigator within a week of his appointment and that he asked co-counsel to assist with the case. Because the trial began on May 18, 2009, he had the case for nearly two years. He stated that there was "ample opportunity to investigate all the witnesses." He said that he would meet with the investigator and the Petitioner to discuss the investigation and that the defense called all the witnesses that were helpful. He said that he and the Petitioner "got along very well." He did not recall having any disagreements with the Petitioner during the trial. He stated that it was his practice to consult with the client, the investigator, and co-counsel regarding the need for further questions before concluding any cross-examination.

Trial counsel said that the defense subpoenaed Tristan Dorsey. He stated that Dorsey had pending charges or convictions at that time. According to counsel, Dorsey's "sole purpose" was to testify that the Petitioner did not have a gun on June 22, 2006. He recalled questioning Dorsey in a witness room next to the courtroom at trial. He stated that Dorsey was not "unequivocal" about whether the Petitioner had a gun on the day of the shooting and that Dorsey would say one thing while his body language would indicate something different. Trial counsel said that Dorsey did not witness the shooting and that Dorsey could not testify as to the Petitioner's whereabouts at the time of the shooting. He said that the shooting occurred several hours after Dorsey and the Petitioner were together. He did not call Dorsey as a witness because he realized that Dorsey "would be shredded on cross-examination." Trial counsel opined that Dorsey was "shifty" and would do more harm than good for the defense. He thought that Dorsey would make a bad impression on the jury. He was certain that he had discussed the matter with the Petitioner, but he could not recall the exact conversation. He said he discussed this trial strategy with co-counsel and the investigator.

Trial counsel testified that he cross-examined Mikeisha Holmes about the television interview. He thought it was "fairly clear" that the woman was Holmes but her face was blurred out due to the inference of gang involvement in the shooting. He did not think Holmes was a good witness because she had pending theft charges and she had provided three inconsistent accounts about the shooting. When counsel questioned Holmes about the interview, she denied that she was the person interviewed. Trial counsel stated that he could not use the video to impeach Holmes "because it wasn't absolutely clear that it was her[.]" He said that there was nothing he could do once Holmes denied being interviewed. He did

-4-

attempt to impeach Holmes with her multiple inconsistent statements. Trial counsel stated that Holmes gave differing statements to the police, in her direct testimony, and at the preliminary hearing regarding her location when she witnessed the shooting. He said that the jury heard this cross-examination about the inconsistent statements. Trial counsel even took the jury to visit the site of the shooting to show the impossibility of the trajectory of where Holmes claimed the Petitioner had been and where the children were located.[2] Counsel thought the trajectory was impossible because the Petitioner would have been four feet below the road and the children were several hundred feet away. He said that the path would have been obstructed by buildings. Trial counsel was "flabbergasted" when he overheard one juror at the crime scene state, "'It's a straight shot.'" He stated that the verdict in the Petitioner's case "kept [him] up at night for years."

Co-counsel testified that he had been practicing law since 2001. He said that he and trial counsel shared office space and often assisted one another on high-profile murder cases. He estimated that he had handled fifty murder cases and said he was capital-certified in Tennessee. He stated that he and trial counsel had tried eight capital cases together. Co-counsel recalled that Tristan Dorsey was subpoenaed in the instant case and that Dorsey would have testified that the Petitioner never made any threats during the day. He opined that it was a "wise decision" not to call Dorsey because Dorsey had seen the Petitioner with a gun before. Co-counsel said that it would have been "problematic" if a defense witness could place a gun in the Petitioner's hand. He stated that he had discussed this issue with trial counsel and their investigator and that they did not want to take the risk of having Dorsey on the stand.

Co-counsel recalled the testimony of Mikeisha Holmes. He opined that "she was a scorned liar" and that he "could not imagine how any trier of fact could have found her credible at all." He said that Holmes "told three different stories" and that her inconsistencies were pointed out through cross-examination. Co-counsel stated that Holmes told yet another story to the news media but that based on the rules of evidence, the defense could not impeach Holmes once she denied being interviewed. He said that Holmes "was already impeached four different ways" and that "[b]y her own admission, she had told different stories." Co-counsel believed that one more impeachment would not have made a difference, especially when they could not "substantially prove" that the woman was Holmes. He thought that the defense presented enough evidence to the jury to create a reasonable doubt in the State's case. Based on the verdict, co-counsel felt that "the jury clearly ignored much of the evidence[.]"

---

[2] The trial court had previously determined the vantage points that the jury could view upon agreement of the parties. The trial court also instructed the jury not to say anything while at the site.

At the conclusion of the hearing, the post-conviction court denied the petition, finding that the facts establishing guilt were "absolutely overwhelming" and that the Petitioner received excellent representation. On April 29, 2013, the court entered a written order denying relief. The Petitioner timely appealed the court's order.

## ANALYSIS

On appeal, the Petitioner contends that trial counsel was ineffective by failing to call Tristan Dorsey as a defense witness and by failing to impeach Mikeisha Holmes with her television interview. In response, the State argues that the post-conviction court properly denied relief because the Petitioner failed to establish that he received ineffective assistance of counsel. We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2012). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation marks and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f)(2012); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States

-6-

Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotation marks and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, this "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

First, the Petitioner contends that trial counsel was deficient in failing to call Tristan Dorsey as a defense witness. Regarding this claim, the post-conviction court found that trial counsel made a tactical decision not to call Dorsey as a witness and that the Petitioner failed to show how he was prejudiced by this decision. We agree with the post-conviction court that trial counsel's failure to call Dorsey was a strategic decision and, therefore, was not deficient

performance by counsel. Trial counsel testified that he subpoenaed Dorsey for the "sole purpose" of establishing that the Petitioner did not have a gun on the day of the shooting. However, after questioning Dorsey, trial counsel and co-counsel determined that Dorsey would cause more damage than good to the defense. Trial counsel opined that Dorsey "would be shredded on cross-examination." Co-counsel said it was a "wise decision" not to call Dorsey to the stand because his testimony would not be worth the risk to the defense. At the post-conviction hearing, Dorsey testified that he was not with the Petitioner at the time of the shooting and that he did not know what the Petitioner was doing in the evening. He stated that when he told the investigator that he had seen the Petitioner with a gun before, what he meant was that they were around guns all the time and that the Petitioner has never had a gun in his hand. Dorsey also acknowledged that he had prior convictions for drug offenses. This court must be highly deferential to counsel's performance, Burns, 6 S.W.3d at 462, and we will not second-guess the informed tactical and strategic decisions of trial counsel. Pylant v. State, 263 S.W.3d 854, 874 (Tenn. 2008) (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). Upon review, we conclude that the Petitioner has not established deficiency or prejudice based on trial counsel's failure to call Dorsey as a witness. Accordingly, the Petitioner is not entitled to relief on this issue.

Next, the Petitioner argues that trial counsel was deficient for failing to impeach Mikeisha Holmes with the television interview. He asserts that trial counsel's error prejudiced the defense and prevented the jury from hearing Holmes present a fourth version of the events.

In its written order, the post-conviction court specifically held that the Petitioner was not entitled to relief for trial counsel's failure to present the videotaped interview to the jury:

> [Trial counsel] and [co-counsel] vigorously cross-examined Ms. Holmes during the course of trial. Trial counsel asked Ms. Holmes about the television interviews. The face of the person who gave the television interview was blurred because of allegations of gang involvement in this case. Ergo, trial counsel could not use the alleged interview as the tape could not be authenticated. Ms. Holmes was impeached with theft convictions and multiple conflicting statements that had been given to the police and at a preliminary hearing. [Co-counsel] believed Ms. Holmes to be a "scorned liar" and was amazed that anyone would believe her. [Co-counsel] testified that Ms. Holmes had been impeached multiple ways.
>
> . . . .

The Petitioner is clearly mistaken when he asserts that the conviction in this case rests solely on the testimony of Ms. Holmes. As summarized on direct appeal, the evidence clearly shows that Thomas Jones heard the shooting and saw the [Petitioner] flee the location of the shooting. Mr. Jones followed the [Petitioner], saw the [Petitioner] in possession of a firearm, and confronted the [Petitioner] about having killed a child. The Petitioner said nothing and fled before the police arrived.

The Petitioner has failed to prove that any additional cross examination of Ms. Holmes would have made a difference in this trial. Ms. Holmes admitted that she had given multiple inconsistent statements regarding this shooting. Ms. Holmes testified that she had given inconsistent statements because she was afraid of being labeled a "snitch" and that she decided to tell the truth after discussing this matter with Jimmy Chambers. Mr. Chambers is a gang investigator that Ms. Holmes had known from high school. Ms. Holmes testified that she would want truthful testimony if somebody had killed her child. The Petitioner is particularly aggrieved because the Petitioner believes that the verdict is "illogical" and that he is not guilty. This issue is without merit.

We conclude that the record fully supports the post-conviction court's determination that trial counsel's failure to present the videotaped interview was not prejudicial. At the post-conviction hearing, both trial counsel and co-counsel testified that they did not consider Holmes to be a credible witness. They stated that through cross-examination, the jury was aware of Holmes's inconsistent statements, her theft convictions, and the fact that she had dated the Petitioner until she learned that he had another girlfriend. Even though trial counsel thought that it was "fairly clear" that the woman in the interview was Holmes, he could not authenticate the video due to the blurred face. When confronted about the news interview, Holmes denied any involvement. Notwithstanding the efforts of counsel to attack the credibility of Holmes and to establish a reasonable doubt as to the Petitioner's guilt, the jury returned a verdict against the Petitioner. Moreover, we agree with the post-conviction court that evidence apart from Holmes's testimony incriminated the Petitioner in the shooting. Under a sufficiency of the evidence analysis, this court on direct appeal affirmed the Petitioner's convictions and concluded:

The jury, as the trier of fact, was entitled to resolve any inconsistencies in Holmes's accounts of the shooting in favor of the State and to reject the testimony of the defense witness who claimed that Holmes was never in a position to witness the shooting. We note that Holmes's eyewitness testimony identifying the defendant as the man who fired gunshots at Collier's vehicle

-9-

was bolstered by the testimony of Thomas Jones, who related how he first saw the defendant running from the area in which he had just heard gunshots and then found him, appearing sweaty and armed with a pistol, on the balcony of the apartment building where Holmes and others were assembled.

Gilliam, 2011 WL 1744226, at *8. We agree with this reasoning and conclude that the Petitioner has failed to show that the outcome would have been different if the jury had heard Holmes present a fourth conflicting account of the shooting. Accordingly, the Petitioner has not met his burden of proof, and he is not entitled to relief.

## CONCLUSION

Upon review, we cannot conclude that the verdict in the Petitioner's trial was undermined or that the proceedings were fundamentally unfair because of the alleged errors of trial counsel. See Strickland, 466 U.S. at 670 ("[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."). The Petitioner is not entitled to post-conviction relief, and the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE